**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 23-1647, 23-1648, 23-1649, 23-1650, 23-1651, 23-1652,
23-1781
_____

OI EUROPEAN GROUP B.V.
v.
BOLIVARIAN REPUBLIC OF VENEZUELA

PETROLEOS DE VENEZUELA, S.A.,
                              Appellant in No. 23-1647
_____

NORTHROP GRUMMAN SHIP SYSTEMS, INC,
f/k/a Ingalls Shipbuilding, Inc.
v.
THE MINISTRY OF DEFENSE OF THE REPUBLIC OF
VENEZUELA

PETROLEOS DE VENEZUELA, S.A.,
                              Appellant No. 23-1648
_____

ACL1 INVESTMENTS LTD.;
ACL2 INVESTMENTS LTD.;
LDO (CAYMAN) XVIII LTD.
v.
BOLIVARIAN REPUBLIC OF VENEZUELA

PETROLEOS DE VENEZUELA, S.A.,
Appellant No. 23-1649

————————

RUSORO MINING LIMITED
v.
BOLIVARIAN REPUBLIC OF VENEZUELA

PETROLEOS DE VENEZUELA, S.A.,
Appellant No. 23-1650

————————

KOCH MINERALS SARL;
KOCH NITROGEN INTERNATIONAL SARL
v.
BOLIVARIAN REPUBLIC OF VENEZUELA

PETROLEOS DE VENEZUELA, S.A.,
Appellant No. 23-1651

————————

GOLD RESERVE INC.
v.
BOLIVARIAN REPUBLIC OF VENEZUELA

PETROLEOS DE VENEZUELA, S.A.,
Appellant No. 23-1652

————————

OI EUROPEAN GROUP B.V.
v.
BOLIVARIAN REPUBLIC OF VENEZUELA,
Appellant No. 23-1781

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Nos. 1-19-mc-00290, 1-20-mc-00257, 1-21-mc-00046,
1-21-mc-00481,
1-22-mc-00156, 1-22-mc-00453)
District Judge: Honorable Leonard P. Stark

_____

Argued
June 1, 2023

_____

Before: BIBAS, MATEY, and FREEMAN, *Circuit Judges.*

(Filed: July 7, 2023)

_____

Jonathan M. Albano
Christopher L. Carter
Morgan Lewis & Bockius
One Federal Street
Boston, MA 02110

Jody C. Barillare
Morgan Lewis & Bockius
1201 N Market Street
Suite 2201
Wilmington, DE 19801

James D. Nelson
David B. Salmons **[ARGUED]**

Morgan Lewis & Bockius
1111 Pennsylvania Avenue NW
Suite 800 North
Washington, DC 20004
    *Counsel for Plaintiff - Appellee in Nos. 23-1647 & 23-1781*

Laura D. Jones
Peter J. Keane
Pachulski Stang Ziehl & Jones
919 N Market Street
P.O. Box 8705, 17th Floor
Wilmington, DE 19801

Robert H. Poole, II
Alston & Bird
1201 W Peachtree Street
One Atlantic Center, Suite 4900
Atlanta, GA 30309

Rajat Rana
Alexander A. Yanos
Alston & Bird
90 Park Avenue
12th Floor
New York, NY 10016
    *Counsel for Plaintiffs - Appellees in Nos. 23-1648 & 1651*

Joshua S. Bolian
Riley & Jacobson
1906 W End Avenue
Nashville, TN 37203

Marie McManus Degnan
Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150, 8th Floor
Wilmington, DE 19899
    *Counsel for Plaintiffs - Appellees in No. 23-1649*

James E. Berger
DLA Piper
1251 Avenue of the Americas
27th Floor
New York, NY 10020

R. Craig Martin
DLA Piper
1201 N Market Street
Suite 2100
Wilmington, DE 19801
    *Counsel for Plaintiff - Appellee in No. 23-1650*

Katherine G. Connolly
Norton Rose Fulbright
555 California Street
Suite 3300
Los Angeles, CA 94104

Matthew H. Kirtland
Norton Rose Fulbright
799 9th Street NW
Suite 1000
Washington, DC 20001

Kevin J. Mangan
Stephanie S. Riley
Matthew P. Ward
Womble Bond Dickinson
1313 N Market Street
Suite 1200
Wilmington, DE 19801
    *Counsel for Plaintiff - Appellee in No. 23-1652*

Aubre Dean
Kevin A. Meehan
Juan O. Perla
Joseph D. Pizzurro
Allesandra D. Tyler
Curtis Mallet-Prevost Colt & Mosle
101 Park Avenue
34th floor
New York, NY 10178
    *Counsel for Intervenor - Appellant Petroleos de Venezuela, S.A. in Nos. 23-1647, 23-1648, 23-1649, 23-1650, 23-1651, 23-1652, 23-1781*

Ginger D. Anders
Kathleen A. Foley
Elaine J. Goldenberg
Donald B. Verrilli, Jr. **[ARGUED]**
Sarah Weiner
Munger Tolles & Olson
601 Massachusetts Avenue NW
Suite 500e
Washington, DC 20001
    *Counsel for Defendant - Appellee Bolivarian Republic of Venezuela in Nos. 23-1647, 23-1648, 23-1649, 23-*

*1650, 23-1651, 23-1652, 23-1781*

Miguel A. Estrada
Matthew S. Rozen
Lucas C. Townsend
Gibson Dunn & Crutcher
1050 Connecticut Avenue NW
Suite 300
Washington, DC 20036

Rahim Moloo
Jason W. Myatt
Robert L. Weigel
Gibson Dunn & Crutcher
200 Park Avenue
47th Floor
New York, NY 10166

> *Counsel Amicus Curiae Crystallex International Corp in Nos. 23-1647, 23-1648, 23-1649, 23-1650, 23-1651, 23-1652, 23-1781*

———————

## OPINION OF THE COURT

———————

MATEY, *Circuit Judge*.

Sovereignty shoulders "[t]hat power . . . whose actions are not subject to the controul of any other power, so as to be annulled at the pleasure of any other human will." Hugo Grotius, The Rights of War and Peace 62 (A.C. Campbell

trans., M. Walter Dunne 1901) (1625).[1] It is a recognition of authority long thought essential for the mutual flourishing of states and "the advantage of their affairs." Emer de Vattel, The Law of Nations 17 (Béla Kapossy & Richard Whatmore eds., 2008) (1758). Congress codified its understanding of foreign sovereignty in the Foreign Sovereign Immunities Act of 1976 ("FSIA").

In this consolidated appeal, six judgment creditors of the Bolivarian Republic of Venezuela hope to attach property held by Petróleos de Venezuela, S.A. ("PDVSA"), Venezuela's national oil company. It all arises from a long-running dispute. Four years ago, this Court wrote the most recent chapter, holding PDVSA operated as Venezuela's alter ego and allowing a judgment creditor (Crystallex International Corporation) to attach PDVSA's shares in a U.S. subsidiary. Our six creditors[2] followed in those footsteps and registered

---

[1] Sovereignty was widely understood as a necessary extension of the natural law. *See, e.g.*, *Thirty Hogsheads of Sugar v. Boyle*, 13 U.S. (9 Cranch) 191, 198 (1815) ("The law of nations" is learned through "resort to the great principles of reason and justice."). In the twentieth century, sovereignty slid more to matters of political and commercial concerns. *See, e.g.*, George K. Foster, *When Commercial Meets Sovereign: A New Paradigm for Applying the Foreign Sovereign Immunities Act in Crossover Cases*, 52 Hous. L. Rev. 361, 369–72 (2014).

[2] OI European Group B.V. ("OIEG"); ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd.; Gold Reserve Inc.; Koch Minerals Sàrl and Koch Nitrogen International Sàrl; Northrop Grumman Ship Systems, Incorporated, formerly known as Ingalls Shipbuilding,

their arbitration awards against Venezuela in the District of Delaware, seeking a writ of attachment against PDVSA's holdings. PDVSA resisted, arguing that changes in Venezuela's government destroyed the factual foundations supporting our prior alter-ego decision. But even accounting for those differences, the District Court correctly concluded that PDVSA remains the alter ego of Venezuela. And because reviewing PDVSA's other arguments would stretch the limited grant of our appellate jurisdiction well beyond the words written by Congress, we decline the invitation and will affirm the District Court's judgment.

## I.

Venezuela boasts the "largest proven oil reserves in the world," a stockpile long under the "significant control" of the state. App. 30 (citations omitted). Venezuela formed PDVSA in 1975 to exploit those resources, but this case has little to do with oil. It centers on Venezuela's expropriation of glass containers and mining interests, missed payments for warship repairs, and bond defaults. And it continues a story we recently summarized in the parallel suit brought by Crystallex International Corporation against Venezuela over the expropriation of gold deposits. We begin with an even shorter summary.

## A.

In 2011, Venezuela nationalized several gold mines and seize the surrounding factories without compensation. That, Crystallex alleged, breached its agreement with Venezuela for

---

Incorporated; and Rusoro Mining Limited. Together, we refer to them as "Creditors."

development rights. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 386 (D. Del. 2018) ("*Crystallex I*"). Crystallex won relief in an international arbitral tribunal, which awarded $1.2 billion plus interest. *Id.* The District Court for the District of Columbia confirmed the award, yielding a federal judgment. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 122 (D.D.C. 2017). When Venezuela did not pay, Crystallex registered its judgment with the Delaware District Court under 28 U.S.C. § 1963[3] hoping to access the assets of PDVSA. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 136 (3d Cir. 2019) ("*Crystallex II*"). Crystallex argued that, as a judgment creditor of Venezuela, it could look to PDVSA for satisfaction because PDVSA "is so extensively controlled by" Venezuela that it may be held liable for the government's shortcomings. *Id.* at 140 (citations omitted). So Crystallex sued Venezuela[4] to attach PDVSA's shares in Petróleos de Venezuela Holding, Inc. ("PDVH"), PDVSA's wholly owned United States subsidiary, under Federal Rule of Civil Procedure 69(a). *Id.* at 132–34. Doing so, Crystallex thought, would ultimately allow it to reach funds in CITGO Petroleum Corporation, a Delaware corporation indirectly

---

[3] Stating that a registered judgment "shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner."

[4] Federal courts have jurisdiction "to confirm an award made pursuant to . . . an agreement to arbitrate, if [] the arbitration takes place or is intended to take place in the United States." 28 U.S.C. § 1605(a)(6). Crystallex's arbitration proceedings against Venezuela occurred before the International Centre for Settlement of Investment Disputes in Washington, D.C. *Crystallex I*, 333 F. Supp. 3d at 386.

owned by PDVH.[5] *See Crystallex I*, 333 F. Supp. 3d at 418 n.36.

PDVSA intervened in the attachment proceeding and moved to dismiss based on its claim to sovereign immunity. *Crystallex II*, 932 F.3d at 134. The District Court denied the motion, finding PDVSA was Venezuela's "alter ego" under the principles outlined in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"). *See Crystallex I*, 333 F. Supp. 3d at 404–14. That finding made PDVSA's property subject to execution to satisfy Venezuela's debt. *Id.* at 416–17.

We affirmed that decision. *See Crystallex II*, 932 F.3d at 150–51. We pointed to Venezuela's economic control over and profit-sharing with PDVSA, its heavy hand in managing PDVSA's affairs, the value extracted from PDVSA, and the ability to avoid obligations in U.S. courts by retaining a separate identity. *Id.* at 146–49. All enough, we concluded, to show that PDVSA was Venezuela's alter ego. *Id.* at 152 ("Indeed, if the relationship between Venezuela and PDVSA cannot satisfy the Supreme Court's extensive-control requirement, we know nothing that can."). And we likewise affirmed the order permitting attachment of PDVSA's shares under the FSIA. *Id.*

---

[5] PDVSA wholly owns the Delaware corporation PDVH, which wholly owns CITGO Holding, Inc., which wholly owns CITGO Petroleum Corporation. *Crystallex I*, 333 F. Supp. 3d at 418 n.36.

**B.**

Hoping to seize on Crystallex's success, Creditors also obtained arbitration awards against Venezuela and Venezuela's Ministry of Defense over debts incurred under broken contracts. Creditors then confirmed their arbitration awards in U.S. courts, registered those judgments with the Delaware District Court pursuant to 28 U.S.C. § 1963, and moved for writs of attachment on PDVSA's shares of PDVH.[6] PDVSA intervened, stressing changes in the relationship between Venezuela and PDVSA since 2019.

In 2018, Venezuelan President Nicolás Maduro disqualified opposition candidates for the presidency and declared himself the victor. Dissatisfied, the National Assembly named opposition leader Juan Guaidó Interim President of Venezuela. In 2019, the U.S. Government recognized Guaidó as Interim President and explicitly withdrew recognition of the Maduro Government, although it acknowledged Maduro's continued power in Venezuela. *See Jiménez v. Palacios*, 250 A.3d 814, 822 (Del. Ch. 2019). In 2019, Guaidó took control of the shares of PDVH, appointing an ad hoc board of directors of PDVSA to manage the U.S. subsidiaries. Guaidó remained Interim President for the rest of the time period relevant to this appeal.

Despite those changes, the Delaware District Court granted Creditors' motion, concluding they had rebutted the presumption that Venezuela and PDVSA are separate and established PDVSA as the alter ego of Venezuela subject to the

---

[6] As in the *Crystallex* proceedings, the District Court had jurisdiction under the FSIA. *See Crystallex Int'l Corp.*, 244 F. Supp. 3d at 109 (applying 28 U.S.C. § 1605(a)(6)).

jurisdiction of the federal courts. Organizing its factual findings around the *Bancec* factors discussed below, the Delaware District Court comprehensively described PDVSA's relationship to Venezuela—considering both the Guaidó Government's control over PDVSA's U.S. assets through its ad hoc administrative board ("Ad Hoc Board") and the Maduro Regime's ongoing control of PDVSA in Venezuela and abroad—and concluded PDVSA remains an alter ego of Venezuela. The Delaware District Court also "incorporate[d] by reference its analysis of the legal standards governing the issuance of writs of attachment (including its discussion of Federal Rule of Civil Procedure 69(a)(1) and 10 Del. C. § 5031) with respect to property of an agency or instrumentality of a foreign sovereign as set out in *Crystallex I*." App. 62 (citing *Crystallex I*, 333 F. Supp. 3d at 388–89, 394–95, 399–401, 404–05).

PDVSA appealed (and Venezuela intervened),[7] challenging the alter-ego finding and asking us to consider the attachment issue under a theory of "pendent appellate jurisdiction." PDVSA also asked for an emergency stay on both divestiture grounds and the traditional discretionary stay factors. After granting an administrative stay, we ordered merits briefing on an expedited schedule. Agreeing with the District Court's well-reasoned opinion and declining to reach the attachment issue, we will affirm.[8]

---

[7] In one of the OIEG matters, Venezuela appealed and PDVSA intervened.

[8] The District Court had subject matter jurisdiction under 28 U.S.C. § 1963, and we discuss our jurisdiction under the collateral order doctrine in Section IV. "We review questions of law *de novo* and findings of fact for clear error,

## II.

We review a narrow question: Did the District Court properly deny PDVSA immunity? The FSIA permitted the District Court to exercise jurisdiction over Venezuela to enforce a judgment based on confirmed arbitration awards against the country.[9] And "so long as PDVSA is Venezuela's alter ego under *Bancec*, the District Court had the power to issue a writ of attachment on that entity's non-immune assets to satisfy the judgment against the country." *Crystallex II*, 932 F.3d at 139. Although PDVSA points to some changes in the

---

and we review *de novo* the ultimate determination whether to treat PDVSA as Venezuela's alter ego." *Crystallex II*, 932 F.3d at 136.

[9] The FSIA's arbitration exception provides that "[a] foreign state shall not be immune . . . in any case . . . in which the action is brought . . . to confirm an award made pursuant to . . . an agreement to arbitrate, if . . . the arbitration takes place or is intended to take place in the United States." 28 U.S.C. § 1605(a)(6).

Creditors confirmed their arbitration awards in United States courts. They then registered their judgments in Delaware District Court. And "when a party establishes that an exception to sovereign immunity applies in a merits action that results in a federal judgment—here, the exception for confirming arbitration awards, 28 U.S.C. § 1605(a)(6)—that party does not need to establish yet another exception when it registers the judgment in another district court under 28 U.S.C. § 1963 and seeks enforcement in that court. Rather, the exception in the merits action sustains the court's jurisdiction through proceedings to aid collection of a money judgment rendered in the case." *Crystallex II*, 932 F.3d at 137 (cleaned up).

structure of Venezuela's government, the nature of the nation's continued involvement in PDVSA's affairs again establishes that PDVSA is Venezuela's alter ego, as will be discussed in Section III. But first, we explain the nature of our examination.

## A.

Enacted in 1976, the FSIA specifies when United States courts will recognize claims of sovereign immunity. Our interpretation of the text must give effect to the legislature's charge, *Brown v. Barry*, 3 U.S. (3 Dall.) 365, 367 (1797), stated through the "ordinary meaning . . . at the time Congress enacted the statute," *Perrin v. United States*, 444 U.S. 37, 42 (1979). Because interpretation "is a holistic endeavor," *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988), some context is key to understanding Congress's aim, *see* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 538–39 (1947) (Legislation "seeks to obviate some mischief, to supply an inadequacy, to effect a change of policy, to formulate a plan of government."); *see also* 1 William Blackstone, Commentaries *61, *87 (George Sharswood ed., 1893) (1765).

The traditional understanding that foreign nations enjoyed "absolute independence" from federal jurisdiction, *see, e.g.*, *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 137 (1812), gave way to a restrictive theory of immunity as nations became more commercially interconnected, *see* George K. Foster, *When Commercial Meets Sovereign: A New Paradigm for Applying the Foreign Sovereign Immunities Act in Crossover Cases*, 52 Hous. L. Rev. 361, 369–72 (2014). Applying this restrictive theory, the Executive determined case-by-case whether a foreign nation would receive sovereign

immunity from suits in U.S. courts. *See* Letter from Jack B. Tate, Legal Adviser, Dep't of State, to Philip B. Perlman, Acting Att'y Gen. (May 19, 1952), *reprinted in* 26 Dep't St. Bull. 984, 984–85 (1952) ("Tate Letter"). But doing so proved difficult diplomatically and politically problematic for two reasons. First, the Executive's determinations were standardless and unpredictable. *See Victory Transp., Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 359 (2d Cir. 1964) ("[T]he 'Tate letter' offers no guide-lines or criteria for differentiating between a sovereign's private and public acts."). Second, "foreign expropriation of American investment was a major foreign policy issue" because "major properties were seized without compensation" in countries like Cuba that went through critical regime changes. *See* Mark B. Feldman, *A Drafter's Interpretation of the FSIA*, Am. Bar Ass'n Section of Int'l Law (Winter 2018), https://www.foster.com/assets/htmldocuments/pdfs/ABA-ACHL-Newsletter-Winter-2018.pdf. Victims of these expropriations generally "had to rely on the State Department to negotiate settlement with the foreign government," but changing regimes and charged relations often left the State Department with no leverage and the victims no relief. *See* Expert Witness Report and Opinion of Mark B. Feldman in Supp. of Pl.'s Opp'n to Defs.' Mot. Dismiss, *In Re: Mezerhane v. Republica Bolivariana de Venezuela*, No. 1:11-cv-23983 (S.D. Fla. 2013) ("Feldman Report"), ECF No. 90-2.

So the Executive asked Congress to make the matter a judicial determination, reasoning "that courts are better equipped than the State Department to make immunity decisions based on law rather than politics." Adam S. Chilton & Christopher A. Whytock, *Foreign Sovereign Immunity and Comparative Institutional Competence*, 163 U. Pa. L. Rev.

411, 412 (2015). Congress agreed, adopting the FSIA to charge judges, not diplomats, with applying the restrictive theory of foreign immunity.[10] *See Samantar v. Yousuf*, 560 U.S. 305, 313 (2010). Now, if a state, or its agency or instrumentality, "expropriate[s] . . . property in violation of international law," "the state can expect to be held accountable for the expropriation in U.S. courts." *See* Feldman Report, *supra*.

## B.

The FSIA provides that foreign states are immune from the jurisdiction of American courts, subject only to exceptions in previous international agreements and the FSIA itself. *See* 28 U.S.C. § 1604. "Foreign state" is defined to include a political subdivision "*or* an agency or instrumentality of a foreign state." *Id.* § 1603(a) (emphasis added).[11] PDVSA

---

[10] *See* Foster, *supra*, at 371–72; *see also* Letter from Robert S. Ingersoll, Deputy Sec'y of State, and Harold R. Tyler, Jr., Deputy Att'y Gen., to Carl O. Albert, Speaker of the House (Oct. 31, 1975), *reprinted in* H.R. Rep. No. 94-1487, at 6634 (1976) (arguing for legislation governing foreign sovereign immunity "to facilitate and depoliticize litigation against foreign states" by "codify[ing] and refin[ing] the 'restrictive theory' of sovereign immunity").

[11] An "agency or instrumentality of a foreign state" is defined as "any entity":

> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

invokes this definition to claim sovereign immunity as an instrumentality of a foreign state. But if a foreign instrumentality's entitlement to sovereign immunity depends on its shared identity with the "foreign state" itself, a natural reading of the FSIA would suggest that a foreign instrumentality shares the immunity of its sovereign owner. *Cf.* Roger O'Keefe, *The Restatement of Foreign Sovereign Immunity: Tutto Il Mondo è Paese*, 32 Eur. J. Int'l L. 1483, 1488–90 (2021) (considering how instrumentalities "assimilate" to the legal personality of a foreign state under the FSIA). Meaning a determination that a foreign state is excepted from jurisdictional immunity under § 1605(a)(6) would also apply to its instrumentalities.

The Supreme Court rejected this reading in *Bancec*. *See* 462 U.S. at 621. Although the Court acknowledged that § 1603(a) defines a "foreign state" to include instrumentalities, *id.* at 620 n.7, it concluded "[t]he language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a foreign state," *id.* at 620. So it directed courts to apply a "presumption" of independent legal status (and thus a separate sovereign immunity) to foreign instrumentalities. *Id*. at 628.

---

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

That new presumption fused the law of corporations and nations.[12] The Court observed that foreign states had started adopting the corporate practice of creating instrumentalities to enjoy benefits associated with independent governance. *Id.* at 624. Without a presumption that an instrumentality's assets and liabilities stand separate from those of the sovereign, third parties might worry that credit extended to an instrumentality will be freely diverted to satisfy its sovereign's debts. *Id.* at 625–26. And without "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity between nations," foreign sovereigns might leave opportunities to advance their unique interests, frustrating the very point of sovereign power. *Id.* at 626.[13]

But like any presumption, this one can be rebutted. The Court "suggested that liability [for instrumentalities] would be warranted, for example, 'where a corporate entity is so extensively controlled by [the state] that a relationship of principal and agent is created,' or where recognizing the state

---

[12] At least one recent scholar has criticized this fusion, emphasizing the differences between private and public corporations when evaluating separate legal status. *See generally* W. Mark C. Weidemaier, *Piercing the (Sovereign) Veil: The Role of Limited Liability in State-Owned Enterprises*, 46 B.Y.U. L. Rev. 795 (2021).

[13] As was common at the time, the Court also quoted a House Report stating that 28 U.S.C. § 1610(b) would not allow execution against the property of one agency or instrumentality to satisfy the judgment of another—unless a court finds that "property held by one agency is really the property of another." *Bancec*, 462 U.S. at 628 (quoting H.R. Rep. No. 94-1487, at 29–30).

and its agency or instrumentality as distinct entities 'would work fraud or injustice.'" *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 822 (2018) (quoting *Bancec*, 462 U.S. at 629–30). And ever since, federal courts have coalesced around five factors (termed "the *Bancec* factors") to aid their analysis. *Id.* at 823.[14]

As we did in *Crystallex II*, 932 F.3d at 141, we consider the *Bancec* factors described in *Rubin* and 28 U.S.C. § 1610(g). But we also take seriously the Supreme Court's caution that *Bancec* wrote no "mechanical formula" for disregarding juridical separateness. *Rubin*, 138 S. Ct. at 822 (quoting *Bancec*, 462 U.S. at 633). The test instead derives from a rough analogy to American corporate law veil piercing,[15] which is

---

[14] Congress also noticed these factors and listed them in an amendment to the FSIA to abrogate *Bancec* in disputes about the property of state sponsors of terrorism. *Rubin*, 138 S. Ct. at 823 (citing 28 U.S.C. § 1610(g)).

[15] American corporations received staunch protections through incorporation statutes passed throughout the nineteenth century. *See, e.g.*, An Act Relative to Incorporations for Manufacturing Purposes, ch. 67, § 3, 1811 N.Y. Laws 350, 351. Courts met abuses of the corporate form by disregarding these protections according to equitable considerations. *See, e.g.*, *Booth v. Bunce*, 33 N.Y. 139, 157 (1865) (If "corporate bodies" are used "to cover up fraud," they "are declared nullities; they are a perfect dead letter; the law looks upon them as if they had never been executed."). When nations started acting like corporations in their commercial relations, governments began analyzing sovereign immunity claims through this corporate lens. *Cf.* Chilton & Whytock, *supra*, at 451 ("[T]he prevailing legal standard did indeed systematically

itself "enveloped in the mists of metaphor." *Bancec*, 462 U.S. at 623 (quoting *Berkey v. Third Ave. Ry. Co.*, 244 N.Y. 84, 94 (1926)). "Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it." *Id.* (quoting *Berkey*, 244 N.Y. at 94).

## C.

Having surveyed the "why" and "how" behind instrumentality sovereignty, we turn to the "what": the facts that should be considered. The District Court evaluated the actions of both the Guaidó and Maduro governments. Appellants' arguments against this approach mostly skip references to the state and instead stress the word "government," a term absent from the relevant FSIA provisions. Venezuela calls PDVSA's relationship to the Maduro Regime "[i]rrelevant," Venezuela Reply Br. 12, and insists we look only to the actions taken by the Guaidó Government and the Ad Hoc Board. We disagree. Text, tradition, and legislative aim all point to the sovereign nation of Venezuela as the operative comparator for our alter-ego analysis. So we must consider the actions of both governments.

## 1.

First, the text. The FSIA codifies foreign sovereign immunity for a "foreign state," 28 U.S.C. § 1604, which "on its face indicates a body politic that governs a particular

---

influence the State Department's immunity decisions: immunity was less likely when the foreign state was a corporate entity (and thus presumably engaged in commercial activity)."). The Supreme Court followed that path in *Bancec*.

territory," *Samantar*, 560 U.S. at 314.[16] One prominent legal dictionary defines "foreign state" as a "foreign country." *Foreign State*, Black's Law Dictionary (11th ed. 2019). And the definition has remained largely unchanged since before the FSIA's passage. *See Foreign State*, Black's Law Dictionary 1578 (4th ed. 1968) (defining a "foreign state" as a "foreign country or nation"). Both entries stress the body politic—the country or nation—rather than the regime presently in power. That aligns with the common understanding of statehood, where governance is just one of several criteria used to define a state. *See* James Crawford, The Creation of States in International Law 45–46 (2d ed. 2006) (describing the "classical criteria for statehood" as a defined territory, a permanent population, an effective government, the capacity to enter into relations with other States, and independence); Restatement (Third) of Foreign Relations Law § 201 (1987) ("[A] state is an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities.").

It also follows *Bancec*, where, despite the facts flowing from the aftermath of the Cuban Revolution, the Supreme Court never mentioned the Castro Regime. Instead, it framed its analysis as determining whether the government instrumentality of Cuba "may be held liable for actions taken by the sovereign." *Bancec*, 462 U.S. at 621. Strong evidence that the relevant "government" in a *Bancec* analysis is the

---

[16] The FSIA does not expressly define "foreign state," except to say that it includes "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a).

foreign country's sovereign, which transcends any administrator.

## 2.

Second, tradition, which accepted that the "sovereign power" does not change "whatever appearance the outward form and administration of the government may put on." 1 Blackstone, Commentaries *49. The Supreme Court has long embraced this differentiation between government representatives and a sovereign. Take *The Sapphire*, where French officials sued in a United States court for damages caused in a collision between a French and American ship. 78 U.S. (11 Wall.) 164, 167 (1870). Defendants sought dismissal, arguing the collision happened under the reign of Napoleon III, who had just been deposed. *Id.* at 166. That was the wrong focus, the Court explained, because the "[t]he foreign state is the true and real owner of its public vessels of war. . . . The . . . party in power[] is but the agent and representative of the national sovereignty. A change in such representative works no change in the national sovereignty or its rights." *Id.* at 168.

Or consider *Guaranty Trust Co. of New York v. United States*, where the Soviet Union sued to recover a bank deposit made sixteen years earlier by the Provisional Government of Russia. 304 U.S. 126, 129 (1938). All agreed that the Soviet Government had only recently been recognized by the United States, making this action one of the first for which its representatives could appear in U.S. courts on behalf of Russia. *Id.* at 138 n.4. Not enough to toll a six-year statute of limitations, said the Court, because, regardless of which representatives are recognized, the "the rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it." *Id.* at 137.

More recently, in *Samantar*, the Supreme Court confirmed the continuing importance of the representative-sovereign distinction. There, the Court held an individual foreign official is not entitled to sovereign immunity as a "foreign state" under the FSIA. 560 U.S. at 308. A "state" is "an entity that has a defined territory and population under the control of a government and that engages in foreign relations." *Id.* at 314 (quoting Restatement (Second) of Foreign Relations Law of the United States § 4 (1964–1965)). While the government controls the state, the state is more than its government. *See id.* ("[T]he [FSIA] establishes that 'foreign state' has a broader meaning, by mandating the inclusion of the state's political subdivisions, agencies, and instrumentalities.").

Now, as before, "[r]ulers come and go; governments end and forms of government change; but sovereignty survives." *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 316 (1936).

**3.**

Third, legislative aim as informed by history. An essential tool of statutory construction that uncovers 1) "how the common law stood at the making of the act"; 2) "what the mischief was, for which the common law did not provide"; and 3) "what remedy the [legislature] provided to cure this mischief." 1 Blackstone, Commentaries *87. All "to suppress the mischief and advance the remedy." *Id.* As recounted, the FSIA was enacted against the common law of foreign sovereign immunity that included Executive determinations. But Congress understood the State Department to have "sought and supported the elimination of its role with respect to claims against foreign states and their agencies or instrumentalities."

*Samantar*, 560 U.S. at 323 n.19. For this Court to hold that the decisions about sovereign immunity from suit are once again an Executive prerogative—whether by importing the act of state doctrine, the political question doctrine, or some other "doctrine"—would undermine the principal purpose of the FSIA: "to transfer primary responsibility for deciding 'claims of foreign states to immunity' from the State Department to the courts." *Id.* at 313 (quoting 28 U.S.C. § 1602).

## D.

Knowing what facts to consider—the actions of both the Guaidó and Maduro governments as the totality of the sovereign conduct of Venezuela—similarly answers the "when" issue. The parties present dueling interpretations of the relevant timeframe for considering Venezuela's actions. We did not resolve the issue in *Crystallex II*. *See* 932 F.3d at 144. On remand, the District Court thought it improper to consider any date after the service of the writ of attachment but acknowledged that consideration of historical events may be necessary for alter-ego analysis. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2021 WL 129803, at *6 & n.4 (D. Del. Jan. 14, 2021). PDVSA and Venezuela argue that the relevant inquiry begins the moment of the filing of the

motion for a writ of attachment,[17] while Creditors ask us to consider instead the time of the injury.[18]

We again decline to take either path. As with the commercial activity determination, "narrowing the temporal

---

[17] Venezuela cites *Dole Food Co. v. Patrickson*, which held that, for federal removal jurisdiction, "instrumentality status is determined at the time of the filing of the complaint." 538 U.S. 468, 480 (2003). But removal is a time-specific inquiry, so there is no reason to assume that holding extends to all other parts of the FSIA.

[18] Creditors offer mostly out-of-circuit or unpublished decisions for the notion that we look to the time the injury occurred. None address the alter ego concept or thoroughly compare competing time periods. *See, e.g.*, *Groden v. N&D Transp. Co.*, 866 F.3d 22, 30 (1st Cir. 2017) (discussing the "pertinent" time in an alter ego ERISA case as the time "when the withdrawal liability arose"); *Energy Marine Servs., Inc. v. DB Mobility Logistics AG*, No. 15-24-GMS, 2016 WL 284432, at *1, *3 (D. Del. Jan. 22, 2016) (stating the moment of injury is "the relevant time frame" with no justification); *Trs. of Nat'l Elevator Indus. Pension v. Lutyk*, 140 F. Supp. 2d 447, 457 (E.D. Pa. 2001) (mentioning that "the relevant time period is the time at which the corporation incurred liability" in a corporate veil case), *aff'd*, 332 F.3d 188 (3d Cir. 2003) (no discussion of time frame); *J.M. Thompson Co. v. Doral Mfg. Co.*, 324 S.E. 2d 909, 915 (N.C. Ct. App. 1985) (stating in a corporate alter ego case, "it must be shown that control was exercised at the time the acts complained of transpired"); *Moran v. Johns-Manville Sales Corp.*, 691 F.2d 811, 817 (6th Cir. 1982) ("It is agency at the time of the tortious act, not at the time of litigation, that determines the corporation's

inquiry" for alter-ego analysis "unnecessarily leaves room for manipulation." *See Crystallex II*, 932 F.3d at 150. We would invite fraud and injustice—the very concerns carefully cautioned against in *Bancec*—by considering only how a state acts after learning that its actions surrounding an instrumentality are under scrutiny. *Cf. Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 850–51 (D.C. Cir. 2000) (considering, in alter-ego analysis, governmental action that occurred before plaintiffs sought financial redress). Little imagination is required: a state could quickly scale back oversight, announce laudable (but long-away) reforms, pass promises of new corporate independence, and perhaps commission a blue-ribbon study panel or two. All while its practices dating back to the injury show an alter ego relationship. Nor is exclusive reliance on the time of injury a satisfying approach. *Cf. EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78, 84–85, 92–94 (2d Cir. 2015) (considering, in alter-ego analysis, sovereign's billion-dollar borrowing from instrumentality after plaintiffs first sought attachment). The conduct of the Castro Regime in *Bancec*[19] shows how a state determined to avoid creditors

---

liability."); *C M Corp. v. Oberer Dev. Co.*, 631 F.2d 536, 539 (7th Cir. 1980) (considering in a corporate veil context whether there was "evidence that [companies] were shells or sham corporations during the period when appellants and their assignors were dealing with them").

[19] *See Bancec*, 462 U.S. at 615–16 ("Bancec was dissolved and its capital was split between Banco Nacional and 'the foreign trade enterprises or houses of the Ministry of Foreign Trade' . . . . All of Bancec's rights, claims, and assets 'peculiar to the banking business' were vested in Banco Nacional . . . . All of Bancec's 'trading functions' were to be

might simply drop vulnerable assets into a new instrumentality and thus "creat[e] juridical entities whenever the need arises." 462 U.S. at 633.

We heed the charge of the Supreme Court drawing on the "application of internationally recognized equitable principles to avoid the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law." *Id*. at 633–34. And we conclude the alter-ego inquiry should consider all relevant facts up to the time of the service of the writ of attachment.

### III.

Considering the totality of Venezuela's control over PDVSA, it is clear PDVSA is Venezuela's alter ego. As in *Crystallex II*, we draw from the "*Bancec* factors," namely:

> (1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence

---

assumed by 'the foreign trade enterprises or houses of the Ministry of Foreign Trade.' . . . [T]he Ministry of Foreign Trade created Empresa. . . . Empresa was dissolved and Bancec's rights relating to foreign commerce in sugar were assigned to Empresa Cubana Exportadora de Azucar y sus Derivados (Cuba Zucar), a state trading company, which is apparently still in existence.") (citations omitted).

> to separate identities would entitle the foreign
> state to benefits in United States courts while
> avoiding its obligations.

*Crystallex II*, 932 F.3d at 141 (quoting *Rubin*, 138 S. Ct. at 823).

### 1. Economic Control

Venezuela exerts significant economic control over PDVSA. Start with the Venezuelan Constitution: Article 12 provides that hydrocarbon deposits within Venezuelan territory are government property, Article 302 reserves state control over petroleum activity, and Article 303 enshrines that the State must retain all shares in PDVSA. *Crystallex II*, 932 F.3d at 147. These statements of authority are not merely aspirational; Venezuelan authorities have dictated PDVSA's sales practices and prices, inside Venezuela and abroad. *Id.* From 2010 to 2016, PDVSA contributed around $77 billion to Venezuelan allies, and in 2017, topped off the tank with the announcement of a $1.2 billion payment on PDVSA bonds along with plans to restructure PDVSA's debt. *Id.* at 147–48.

Appellants argue drastic changes arrived in 2019, but as the District Court explained, new structures did not alter Venezuela's significant control. In March 2019, Maduro ordered the transfer of PDVSA's European Office from Lisbon to Moscow. Manuel Salvador Quevedo Fernández, a National Guard Major General who was Minister of Housing and Habitat before being appointed by Maduro as both oil minister and president of PDVSA, announced the completion of the European Office's move that September. A month later, he

signed a commercial contract with an Indian corporation. In May 2020, PDVSA on its website advised that, heeding Maduro's directive, it would increase the price of gasoline in Venezuela. It also announced to owners of service stations that, under Maduro's Executive Order 4.090, it could rescind service station licenses—which it promptly did.

Much the same has followed in the United States, where the Guaidó Government holds direct access to PDVSA's U.S. bank accounts, manages (and offered to renegotiate) PDVSA's bond debt, sent PDVSA money earmarked for legal bills, and considers PDVSA's property "Venezuelan assets held abroad." App. 44–46.

True, the Guaidó Government has encouraged PDVSA's Ad Hoc Board to become more independent. But given the Maduro Government's continued extreme control of PDVSA in Venezuela and abroad, and the Guaidó Government's substantial control of PDVSA's American operations, the facts reveal Venezuela's significant economic control of PDVSA through both rival governments.

## 2. Profits

Not all the *Bancec* factors are complicated inquires, and here, just as we explained in *Crystallex II*, "[a]s PDVSA's lone shareholder, all profit ultimately runs to the Venezuelan government." 932 F.3d at 148. Profits, we noted, that PDVSA paid back to Venezuela accompanied by taxes and royalties, sometimes at an artificially high rate. *Id.* And the Guaidó Government retains direct access to PDVSA's U.S. bank

accounts, one of the assets PDVSA's Ad Hoc Board has regularly characterized as Venezuela's.

### 3. Management

Venezuelan officials are vital to management of PDVSA and maintain a strong presence in its daily affairs. We explained that "President Maduro appoint[ed] PDVSA's president, directors, vice-presidents, and members of its shareholder council." *Id.* Appointments that included roles for military leaders and high government officials, sharing office space with the Ministry of Petroleum and Mining. *Id.* Even lower-level employees faced threats of termination if they did not attend Maduro's political rallies and vote for his coalition in elections. *See id.* Nothing has changed since 2019, with Maduro calling on PDVSA workers to attack Guaidó, tasking the Minister of Petroleum to restructure PDVSA and attend an OPEC meeting on behalf of both Venezuela and PDVSA, and making political announcements from PDVSA's offices.

Similarly, as the Delaware District Court found, "Mr. Guaidó [is empowered] to appoint and remove an Ad Hoc Board of Directors to exercise rights as PDV Holding's shareholder, including appointing and removing board members to PDV Holding, CITGO, and other affiliates." App. 46–47 (citations omitted).[20] "PDVSA's Ad Hoc Board acknowledges that it operates at the 'directives' of the Guaidó Government." App. 47. The National Assembly requires

---

[20] Appellants argue the Guaidó Government has not pursued the same corrupt management as its predecessors, a point we need not refute. Because it is control, not corruption, that we evaluate—the means and ways of management, not the ends those actors pursue.

PDVSA to obtain prior approval for "national interest" contracts, which PDVSA's Ad Hoc Board has suggested could cover all PDVSA's agreements. App. 49. A theory consistent with PDVSA's practice of sending every contract with foreign parties to the National Assembly for approval. All backed up by the Guaidó Government's domination of PDVSA's legal strategy, including sharing lawyers and directing when and how PDVSA pays its debts.

The parties disagree about the degree of that control, with PDVSA arguing it all falls short of complete day-to-day operational command. But neither this Court nor the Supreme Court has ever held absolute day-to-day control over operations to be necessary or even the touchstone of the alter-ego inquiry. We do not buck that trend, and instead look to all, not one, of the facts. Together, they reveal a high degree of governmental management of PDVSA's affairs.

### 4. Beneficiaries

PDVSA exists to benefit Venezuela. PDVSA paid Venezuela's administrative fees for Venezuela's arbitration with Crystallex, and Venezuela gave PDVSA a number of mining rights for no consideration. *Crystallex II*, 932 F.3d at 149. Venezuela committed PDVSA to sell oil to Caribbean and Latin American allies at steep discounts to further Venezuela's policies, often with deferred payments to Venezuela, not PDVSA. *See id.* at 147–49. Senior members of the Maduro Regime used PDVSA's aircraft for state purposes, a practice that continued well after the 2019 election.

The Guaidó Government has not taken identical steps, but it still views PDVSA as key to advancing its political goals. The Delaware District Court found that PDVSA's Ad Hoc

Board repeatedly described its mission as safeguarding its assets for the country of Venezuela, and that "Mr. Guaidó and his government regularly characterize PDVSA and its related assets, such as CITGO, as assets of the State." App. 50. As Venezuela points out, the Guaidó Government's declarations in the Democracy Transition Statute and Presidential Decree No. 3 have encouraged PDVSA to act economically rather than "on behalf of the government at its own expense." Venezuela Opening Br. 37. But an instrumentality need not harm itself to benefit the sovereign. Together with the actions of PDVSA in Venezuela, this factor is satisfied.

### 5. Equity

Consider, finally, how Venezuela arrives in this Court. The state owes on judgments but denies we have jurisdiction to allow remedies aimed at PDVSA. All while "PDVSA, and by extension Venezuela, derives significant benefits from the U.S. judicial system." *Crystallex II*, 932 F.3d at 149. PDVSA enjoys the benefits and protections of United States law, including 2020 bonds "backed by the common stock and underlying assets of U.S.-based corporations," with "the U.S. legal system [a]s the backstop that gives substantial assurance to investors who buy PDVSA's debt." *Id.* (internal citations omitted). Observations that still ring true.

Venezuela responds that this rationale would demand an alter-ego finding in every case. That concern is misplaced. Access to the courts of the United States is more than an incidental benefit for PDVSA and its three Delaware-corporation subsidiaries. And we again note that our analysis checks the entire record, not detached boxes.

That all the *Bancec* factors weigh towards finding an alter-ego relationship does not control our inquiry, but it is more than mere coincidence. It reflects our long running practice of "declin[ing] to adhere blindly to the corporate form where doing so would cause such an injustice." *Bancec*, 462 U.S. at 632. For those reasons, PDVSA remains the alter ego of Venezuela and lacks sovereign immunity.[21]

## IV.

PDVSA and Venezuela ask us to consider an issue beyond the Delaware District Court's denial of sovereign immunity: the attachment of PDVSA's shares in PDVH. But Congress has only given the federal circuit courts jurisdiction over "appeals from all final decisions of the district courts." 28 U.S.C. § 1291. A "final decision" is "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945). Often, that means dissatisfied parties must wait rather than appeal, even, as is common, when time is money. "[I]ndeed, 'the possibility that a ruling may be erroneous and may impose additional litigation expense is not sufficient to set aside the finality requirement imposed by Congress.'" *Weber v. McGrogan*, 939 F.3d 232, 236 (3d Cir.

---

[21] Even if we were to disregard the lessons we have taken from the history of sovereign immunity and the FSIA and look only to the actions of the Guaidó Government, the result would not change. The District Court found the Guaidó Government's direction and control over PDVSA was analogous to the direction and control of the Maduro Government as identified by this Court in *Crystallex II*. That finding was not clearly erroneous based on the actions of the Guaidó Government we have detailed above.

2019) (quoting *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 436 (1985)).

Despite the clarity of 28 U.S.C. § 1291, we have long allowed decisions denying sovereign immunity under the FSIA to be immediately appealed under the "collateral order doctrine." *See Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1282 (3d Cir. 1993) (walking through the *Cohen* factors and joining other circuits in "decid[ing] that we have appellate jurisdiction [over denials of sovereign immunity under the FSIA] pursuant to the collateral order doctrine").[22]

---

[22] A conclusion reached by every other circuit to consider the question. *See Segni v. Com. Off. of Spain*, 816 F.2d 344, 347 (7th Cir. 1987); *Compania Mexicana De Aviacion, S.A. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 859 F.2d 1354, 1358 (9th Cir. 1988) (per curiam); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990); *Stena Rederi AB v. Comision de Contratos*, 923 F.2d 380, 385 (5th Cir. 1991); *Eckert Int'l, Inc. v. Gov't of Sovereign Democratic Republic of Fiji*, 32 F.3d 77, 79 (4th Cir. 1994); *Honduras Aircraft Registry, Ltd. v. Gov't of Honduras*, 129 F.3d 543, 545 (11th Cir.1997); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 755–56 (2d Cir. 1998); *Southway v. Cent. Bank of Nigeria*, 198 F.3d 1210, 1214 (10th Cir. 1999); *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 293 (1st Cir. 2005); *O'Bryan v. Holy See*, 556 F.3d 361, 372 (6th Cir. 2009). The Eighth Circuit does not appear to have directly addressed this point, although in passing seems to agree. *See BP Chems. Ltd. v. Jiangsu SOPO Corp. (Grp.)*, 420 F.3d 810, 818 (8th Cir. 2005).

Under *Cohen*'s test, concluding an appeal of a denial of sovereign immunity is immediately appealable makes sense. A

Appellants ask us to take our jurisdiction even farther from the text of § 1291 and consider the propriety of attachment under the Federal Rules using "pendent appellate

---

non-final order is reviewable under the collateral order doctrine if it: 1) conclusively determines the disputed issue; 2) resolves an important issue separate from the merits of the action; and 3) would be effectively unreviewable on appeal from the final judgment. *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 105 (2009); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949). Denials of sovereign immunity fit the bill. They conclusively determine whether a party is subject to continuing litigation, but are distinct from the merits. And reviewing a denial after a final judgment is of no help to the sovereign. All similar to denials of qualified immunity and Eleventh Amendment immunity the Supreme Court has held are immediately appealable under the collateral order doctrine. *See, e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993).

Still, concerns remain, and the Supreme Court has "described the conditions for collateral order appeal as stringent." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994). The doctrine as announced through *Cohen* is an example of "the displacement of apparently controlling, nonjudicial, primary texts." Mitchel de S.-O.-l'E. Lasser, *"Lit. Theory" Put to the Test: A Comparative Literary Analysis of American Judicial Tests and French Judicial Discourse*, 111 Harv. L. Rev. 689, 702 (1998). And the trend has only become trendier given the "textualization of precedent," the practice of treating judicial opinions like statutes. *See* Peter M. Tiersma, *The Textualization of Precedent*, 82 Notre Dame L. Rev. 1187, 1188 (2007).

jurisdiction." But the collateral order doctrine is already an expansion of § 1291, and pendent appellate jurisdiction further "drift[s] away from the statutory instructions Congress has given to control the timing of appellate proceedings." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 45 (1995). As the Court explained, the "procedure Congress ordered" for adding to "the list of orders appealable on an interlocutory basis" "is not expansion by court decision, but by rulemaking under § 2072" of the Rules Enabling Act. *Id*. at 48. Indeed, the unanimous Court declined to "definitively or preemptively settle . . . whether or when it may be proper for a court of appeals, with jurisdiction over one ruling, to review, conjunctively, related rulings that are not themselves independently appealable." *Id.* at 50–51. Meaning the Court "reserved the very *existence* of" pendent appellate jurisdiction. Stephen I. Vladeck, *Pendent Appellate Bootstrapping*, 16 Green Bag 2d 199, 205 (2013).

Heeding that warning, in the years after *Swint*, this Court has exercised pendent appellate jurisdiction in only two narrow circumstances: 1) when an otherwise non-appealable order is "inextricably intertwined" with an appealable order, and 2) when "necessary to ensure meaningful review of the appealable order." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.*, 269 F.3d 187, 203 (3d Cir. 2001). Orders are "inextricably intertwined" "only when the appealable issue cannot be resolved without reference to the otherwise unappealable issue." *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 130 (3d Cir. 2018) (citations and quotation marks omitted). That "the two orders arise out of the same factual matrix" is insufficient, "even if considering the orders together may be encouraged under considerations of efficiency." *Id.* (citation and quotation marks omitted). The question is whether the appealable order can be "dispose[d]

of . . . without venturing into otherwise nonreviewable matters." *Id.* at 131 (citation omitted). If so, we "have no need—and therefore no power—to examine the [nonreviewable] order." *Id.* (citation omitted).

Venezuela argues not only that the immunity and attachment issues are "inextricably intertwined," but that they are "coextensive." Venezuela Opening Br. 44. Because the District Court applied the *Bancec* common law alter-ego test to the immunity inquiry, Venezuela says, "sufficient overlap in the facts relevant to both the appealable and nonappealable issues" warrants review of the attachment issue now. Venezuela Opening Br. 44–45 (citation omitted). We disagree. The immunity inquiry used the *Bancec* factors to determine whether a state exercises such extensive control over an instrumentality that it may be considered an "alter ego" of the state. The attachment inquiry invoked *Bancec* to evaluate whether PDVSA's property can be attached to pay out a judgment. Resolution of the immunity issue does not dictate the outcome of the attachment issue. So we will not wade into the attachment waters, mindful that "loosely allowing pendent appellate jurisdiction would encourage parties to parlay . . . collateral orders into multi-issue interlocutory appeal tickets." *Swint*, 514 U.S. at 49–50. Even if we could consider the attachment issue, we would decline to do so in our discretion. *See United States v. Spears*, 859 F.2d 284, 287 (3d Cir. 1988) ("[O]nce we have taken jurisdiction over one issue in a case, we may, in our discretion, consider otherwise nonappealable issues in the case as well, where there is sufficient overlap in the facts relevant to [the appealable and nonappealable] issues to warrant our exercising plenary authority over [the] appeal." (quoting *San Filippo v. United States Tr. Co.*, 737 F.2d 246, 255 (2d Cir. 1984))).

\* \* \*

The District Court did not clearly err in its factual determinations and did not legally err in its application of the *Bancec* factors. For the second time in five years, we conclude that PDVSA is the alter ego of Venezuela, and we will affirm the District Court's denial of sovereign immunity to PDVSA.